ORDERED.

**Dated:  March 31, 2016**

Jerry A. Funk
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

IVEDENT LLOYD, JR.,                                        Case No. 3:14-bk-1765-JAF

      Debtor.                                              Chapter 7
_____

HOLLAND BUILDERS, INC.
and SHELTAIR WESTHAMPTON,
LLC,

      Plaintiffs,
v.                                                       Adv. No. 3:14-ap-276-JAF

IVEDENT LLOYD, JR.,

      Defendant.
_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This proceeding came before the Court upon a Complaint Objecting to Discharge of the

Debtor and/or to Challenge Dischargeability of Certain Debts (the "Complaint") (Doc. 1).  Count

I of the Complaint is an objection to Defendant's discharge pursuant to 11 U.S.C. §

727(a)(4)(A).  Count II of the Complaint seeks to except Defendant's debt to Plaintiffs from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(2)(A).  Count III of the Complaint seeks to except Defendant's debt to Plaintiffs from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(6).  The Court held a trial on October 15, 2015.  Thereafter, in lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions.  Upon the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Sheltair Aviation builds and services fixed based operations, which are facilities that serve the needs of private plane owners, such as fuel, catering, and rental car needs.  (Tr. at 155).  Sheltair Aviation owns fixed based operations in Florida, Georgia, and New York.  (Tr. at 155-156).  Holland Builders, Inc. ("HBI") is the construction arm of Sheltair Aviation; if Sheltair Aviation builds a fixed base operation for itself or a third party, HBI constructs the facility.  (Tr. at 147).  Sheltair Westhampton, LLC ("SWH") is Sheltair Aviation's fixed based operation in Westhampton, New York.  (Id.)

In 2006, HBI hired Robert McQuaig ("McQuaig") as its senior vice president of construction.  (Tr. at 148).  McQuaig's responsibilities included traveling to various locations to look at prospective projects for HBI.  (Tr. at 149-150).  If HBI was hired to construct a facility, McQuaig was responsible for the entire project "[f]rom A to Z," including budgeting with project managers and hiring subcontractors.  (Tr. at 150).

Defendant is a high school graduate who attended junior college for a year.  (Tr. at 82).  Since leaving college, Defendant has worked as a machinist.  (Tr. at 82).  In 2007, Defendant opened Marion Machine & Tool, LLC ("MM&T").  (Tr. at 23).  MM&T was a machine shop

that performed work for industrial companies such as concrete and drilling companies and also constructed race car components such as chassis and motors.  (Tr. at 100).  Defendant also drives race cars.  (Tr. at 83).

Defendant met McQuaig in approximately 1996 through dirt track car racing.  (Pls.' Ex. 27 at 1).  Over the course of the parties' relationship, Defendant observed that McQuaig had new cars, nice houses, and appeared to never have any money issues.  (Tr. at 76).  Defendant testified that "it would be nothing for [McQuaig] to give me $20,000 for work to be done on a race car or in payment for steel products fabricated by MM&T."  (Pls.' Ex. 27 at 1).

At some point, Defendant and McQuaig entered into an informal, unwritten agreement by which Defendant agreed to construct and work on race cars for McQuaig.  (Tr. at 91).  The arrangement was a "pay-as-you-go" one.  (Id.)  According to Defendant, "[McQuaig] wanted to get some newer stuff.  [McQuaig] and [McQuaig's son] were wanting to do a little bit more racing and go further out of town racing, and they were trying to get better equipment so they could go do more racing."  (Id.)  Defendant and McQuaig did not discuss potential expenses with any specificity.  (Id.)  "[McQuaig] had a general idea of, you know, what stuff costs and stuff. It's kind of more roundabout numbers.  It wasn't exact numbers put down, it was more of a generalization.  He knew about what the cars cost and stuff like that."  (Id.)

According to Defendant, in early June of 2008 he contacted McQuaig inquiring as to whether McQuaig was interested in purchasing race car parts and a motor from Defendant's cousin.  (Pls.' Ex. 27 at 1).  McQuaig was interested.  (Id.)  McQuaig told Defendant that he had money available to him from projects on which he saved money for HBI and directed Defendant to prepare an invoice from MM&T to HBI in the amount of $23,756.13 and to list "lot misc steel" on the invoice for the description of the product provided to HBI by MM&T.  (Id. at 2).

3

Defendant prepared the invoice and e-mailed it to McQuaig on June 13, 2008.  (Tr. at 121-122).  On June 17, 2008, Defendant received a check from HBI in the amount of $23,756.13; thereafter he paid his cousin $20,000.00 on behalf of McQuaig for a racing motor, wheels, tires, gears, and other race car parts.  (Pls.' Ex. 27 at 2).  Defendant did not provide any goods or services to HBI in exchange for the $23,756.13 payment.  (Id.)

Defendant testified that McQuaig wanted Defendant to construct new cars for him and his son to participate in Speedweeks [in Daytona in early 2009].  (Tr. at 93).  McQuaig wanted to follow Defendant around and race with him.  (Id.)  However, the project was postponed for several months because Defendant was racing during the middle of 2008.  (Id.)

On November 4, 2008, at McQuaig's direction, Defendant prepared an invoice from MM&T to HBI in the amount of $63,325.00.  (Pls.' Ex. 27 at 2).  The purpose of the invoice was to purchase race car parts for McQuaig.  (Id. at 3).  The invoice listed "misc steel" as the product provided to HBI by MM&T.  (Id. at 2).  Defendant e-mailed the invoice to McQuaig.  (Tr. at 121-122).  On November 6, 2008, Defendant received a check from HBI in the amount of $63,325.00 which he deposited into his MM&T account.  Defendant anticipated using the proceeds for the bulk of the parts for the first race car he was constructing for McQuaig.  (Tr. at 94).  To Defendant's surprise, McQuaig directed Defendant to return $20,000.00.  (Id.)  On November 25, 2008, at McQuaig's request, Defendant wrote a check to ASI, a company owned by McQuaig, in the amount of $20,000.00.  (Pls.' Ex. 27 at 3).  The remaining $43,325.00 was used to purchase parts and to pay for Defendant's labor to build McQuaig's race cars.  (Id.)  However, that amount was not enough to fund the purchase of all of the parts needed to complete the race cars.  (Tr. at 94).  MM&T did not provide any services to HBI in exchange for the $63,325.00 payment.  (Pls.' Ex. 27 at 3).

Defendant continued to build race cars for McQuaig and to provide maintenance services for race cars that McQuaig and McQuaig's son were racing.  (Tr. at 97-98).  Between December 10, 2009 and March 17, 2010, Defendant received four checks payable to MM&T from SWH. (Pls.' Ex. 27 at 4-5).  The dates and amounts of the checks are as follows: 1) a check dated December 10, 2009 in the amount of $45,775.40; 2) a check dated January 25, 2010 in the amount of $46,707.50; 3) a check dated March 3, 2010 in the amount of $41,853.58; and 4) a check dated March 17, 2010 in the amount of $41,853.57.  (Id.)  McQuaig instructed Defendant to keep $10,000.00 from each check and to disburse the remaining funds to Owens & Associates, a company owned by McQuaig.  (Id.)  Defendant kept $10,000.00 from the December 10, 2009 check, $10,707.50 from the January 25, 2010 check, $10,000.58 from the March 3, 2010 check, and $10,000.00 from the March 17, 2010 check and paid the remainder to Owens & Associates. (Id.)  Although McQuaig told Defendant that the money he received was saved from HBI/SWH jobs, Defendant did not ask for, and McQuaig did not provide, any further explanation.  (Id. at 3).  Unbeknownst to Defendant, McQuaig had created and submitted three fraudulent invoices from MM&T to HBI in order to induce SWH to remit the four payments to MM&T.[1]  (Id.)

Prior to Defendant's receipt of the four checks from SWH, McQuaig's, McQuaig's son, and another individual came to MM&T and put Sheltair Aviation and HBI logos on one of the race cars Defendant had built for McQuaig.  (Tr. at 125-126).  The car, emblazoned with Sheltair Aviation and HBI logos, was then transported from MM&T to Sheltair Aviation's fixed based operation located at the Daytona Beach International Airport (next to the Daytona International Speedway) where it was displayed during the Pepsi 400 race.  (Id. at 96).  Defendant saw a picture of the car displayed at Sheltair Aviation's facility.  (Tr. at 97).  Defendant believed that

---

[1] The March 3, 2010 and the March 17, 2010 payments were on account of one invoice.

HBI and Sheltair Aviation were sponsoring McQuaig's racing endeavors.  (Def.'s Ex. 10 at ¶ 14; Tr. at 104).

Defendant testified that he did not question or find it unusual that McQuaig gave him checks issued by HBI or SWH or that McQuaig asked him to return a portion of the money. Because of Defendant's long term relationship with McQuaig, Defendant believed he knew McQuaig well, found him trustworthy, and considered him a friend.  (Tr. at 75-76).  Defendant testified that McQuaig "was pretty good at garnering the trust of a lot of people."  (Tr. at 76). Defendant explained his trust as follows: "[McQuaig] didn't spend extravagant amounts of money.  He didn't fly around in jet airplanes and have big yachts, but he also never squirmed about spending a little bit of money on a race car or helping you pour concrete or do anything else.  So that is the answer to your question, the reason why I have no—did not doubt him in one way, shape or form."  (Tr. at 76).  McQuaig explained to Defendant that his employer allowed him to use the excess money for himself "as he saw fit" if he completed construction projects early or in a timely manner.  (Pls.' Ex. 27 at 1).  Accordingly, Defendant believed that by virtue of McQuaig's position at HBI, McQuaig could spend large amounts of money on whatever he wanted to.  (Tr. at 77).

At some point, Sheltair Aviation hired an investigator who determined that McQuaig had embezzled approximately 2 million dollars over a three-and-a-half-year period.[2]  The embezzlement scheme involved a process by which McQuaig directed individuals, on behalf of businesses, to create and remit invoices to HBI for expenses associated with HBI projects despite the fact that the businesses had not performed the invoiced work.  Upon receipt of payment from HBI or SWH, the individuals/businesses remitted a portion of the payment received to entities

---

[2] Defendant first became aware of the fraudulent invoices from McQuaig to HBI in July of 2010 when he was interviewed by Plaintiffs' investigator.  (Pls.' Ex. 27 at 6; Tr. at 95, 102).

owned by McQuaig and retained the remainder.  As part of the embezzlement scheme, McQuaig himself also created a number of false invoices.

In 2010, Plaintiffs (and other related entities) filed a Complaint ("the State Court Complaint") against McQuaig, Defendant, and others in the Circuit Court in and for Broward County, Florida (the "State Court Action").  (Pls.' Ex. 28).  Count I of the State Court Complaint alleged conversion.  (Id.)  On February 10, 2012, the court in the State Court Action entered a judgment (the "Judgment") as to Count I: 1) in favor of HBI and against Defendant, MM&T and others, jointly and severally, in the amount of $87,081.13; and 2) in favor of SWH and against Defendant, MM&T and others, jointly and severally, in the amount of $176,190.05.  (Id.)  The Judgment made no findings that Defendant acted with fraudulent intent when he received the payments from HBI and SWH.  (Id.)

After the entry of the Judgment, Plaintiffs vigorously pursued collection action against Defendant.  On March 26, 2012, Defendant completed a Fact Information Sheet for MM&T in the State Court Action wherein he was required to list MM&T's bank account information. (Pls.' Ex. 30).  Shortly thereafter, Plaintiffs garnished MM&T's bank account.  As a result, Defendant dissolved MM&T, registered Marion Machine Tool (the "Second MM&T") as a fictitious name with the Florida Department of State (Pls.' Ex. 42), and opened a bank account at Community Bank & Trust of Florida in the name of "[Defendant] d/b/a Marion Machine & Tool" (the "Community Trust Account"). (Pls.' Ex. 37; Tr. at 26).  Despite registering the Second MM&T as a fictitious name and opening the Community Trust Account, Defendant continued to issue invoices to customers with MM&T written thereon and deposited checks made out to MM&T into the Community Trust Account.  (Tr. at 27).  Defendant did not notify MM&T's customers that it had been dissolved.  (Tr. at 28).

On May 7, 2013, Defendant was deposed in the State Court Action and was asked by Plaintiffs' counsel whether the information provided in the March 26, 2012 Fact Information Sheet was correct and accurate as on May 7, 2013.  (Pls.' Ex. 32 at 7-8).  During that deposition Defendant testified that the information was correct and accurate with the caveat that, while he was still the sole shareholder of MM&T, it was not active as an LLC because he had not renewed the LLC designation with the Florida Department of State.  (Id.)  Defendant made no mention of the Community Trust Account.  Defendant began working for IBS, Manufacturing, LLC, a company owned by his father, in December 2012 and worked there until October 2013 when Plaintiffs garnished the business's bank account.  (Tr. at 35, 60).  Defendant was a signatory on the IBS Manufacturing, LLC payroll account and wrote checks to himself for his wages and wrote checks to MM&T and the Second MM&T.  (Tr. at 35).

On April 15, 2014, Defendant filed a Chapter 7 bankruptcy petition.  (Pls.' Ex. 1).  On Schedule I of his bankruptcy petition, Defendant listed gross monthly income of $2,243.12 for himself, gross monthly income of $3,556.00 for his non-filing spouse, a combined monthly income of $4,740.12, and a negative monthly net income of $237.26.  (Id.)  In response to item 1 of his Statement of Financial Affairs (the "Original SOFA"), which reads "[s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business … from the beginning of this calendar year to the date this case was commenced … [as well as] gross amounts received during the two years immediately preceding this calendar year," Defendant indicated that his 2014 year to date $66,699.00 gross income was from self-employment, his 2013 $13,840.00 gross income was from self-employment, and his 2012 $15,970.00 gross income was from self-employment.  (Id.)  Defendant filed an attachment to his B22A Statement, entitled Calculation of Current Monthly

8

Income (the "CMI Calculation"), which respectively indicated the following for the months of October, November, and December 2013: 1) gross income of $23,870.29 and expenses of $21,383.40, resulting in net income of $2,486.89; 2) gross income of $27,523.32 and expenses of $23,174.79, resulting in net income of $4,357.53; and 3) gross income of $29,257.74 and expenses of $27,506.35 resulting in net income of $1,751.39.    (Id.)    Taking into account Defendant's gross income, expenses, and net income for the months of January, February, and March 2014, Defendant's current monthly income was $2,243.11, the approximate amount he listed as his income on Schedule I.    (Id.)    The CMI Calculation indicated that Defendant's income was from self-employment and racing.

Defendant testified that he arrived at the amount listed as his 2012 income on the Original SOFA from his 2012 federal income tax return.    (Tr. at 53).    However, Defendant's 2012 tax return, filed jointly with his wife, does not reflect gross self-employment income of $15,970.00 or that Defendant earned any wages in 2012.    (Def.'s Ex. 5).    The tax return reflects the following for MM&T: gross receipts of $236,572.00, cost of goods sold of $181,515.00, and expenses of $105,943.00 for a net loss of $50,886.00.    (Id.)    For Defendant's auto racing ventures, the tax return reflects gross receipts of $46,225.00 and expenses of $47,685.00 for a loss of $1,460.00.    The tax return reflects a total business loss of $52,346.00.    (Id.)    The origin of the $15,970.00 on Defendant's Original SOFA is unclear.

Defendant has not filed his 2013 federal income tax return.    Defendant testified that in calculating his 2013 income on his Original SOFA he reviewed bank statements and 1099s from his racing endeavors and determined that "there was nothing left."    (Tr. at 108).[3]    Defendant then

---

[3] Defendant's testimony as to whether he used the 1099s to calculate his 2013 income is inconsistent.    Defendant first stated on direct examination that he did not include his 1099 income from 2013 to calculate his 2013 income on the original SOFA.    (Tr. at 48).    On cross examination, Defendant testified that he did use his 1099s.    (Tr. at 85). After being confronted on redirect with his prior deposition testimony where he testified that he did not have his

referred to his W-2 from IBS Manufacturing, LLC, which reflected wages in the amount of $10,840.00 paid to Defendant through October 2013.  (Tr. at 44-45).  Defendant testified that although he did not receive any payroll checks from IBS Manufacturing, LLC after October 2013, he continued working for and receiving money from the company.  (Tr. at 45).  He estimated that amount to be $3,000.00.  (Id.)  Defendant added the wages of $10,840.00 with the $3,000.00 to arrive at the $13,840.00 figure.  (Id.)  In other words, the income Defendant listed as gross self-employment income for 2013 on the Original SOFA was wages earned as an employee of IBS Manufacturing, LLC plus $3,000.00, not self-employment income.

On May 27, 2015, Defendant filed an Amended Statement of Financial Affairs (the "Amended SOFA").  (Pls.' Ex. 21).  Defendant's Amended SOFA listed the following income for 2013: 1) gross self-employment income from Marion Machine & Tool of $329,821.78; 2) self-employment income from auto racing of $23,705.00; 3) "income from scrap" of $580.71; and 4) wages from IBS of $10,840.00.  (Id.)  Defendant's Amended SOFA listed the following income for 2012: 1) Gross self-employment income from Marion Machine & Tool of $304,120.39 and self-employment income from auto racing in the amount of $46,225.00.  (Id.)

Defendant testified that he calculated his 2012 and 2013 income on the Amended SOFA by adding up all of the deposits listed on his bank statements.  (Tr. at 49, 53, 56).  Defendant testified that because he deposited the checks he received from racing (for which he received 1099s) into the [MM&T and the Second MM&T] bank accounts, the Amended SOFA potentially overstated his income.  (Tr. at 99-100).

When asked why he did not include the omitted income on his Original SOFA, Defendant testified "I didn't know [it was] my income … [W]e were using the money to start

_____

1099s at the time he filed the Original SOFA, Defendant testified that he had "no clue" how he could have relied on 1099s he did not have.  (Tr. at 127-128).

jobs, buy steel, do different things.  I didn't realize that was income to me personally."  (Tr. at 36).  Defendant elaborated further: "[T]he way our accountant's always done it, income to me, is what was left over.  That's not my income.  If there's $300,000 in the bank, that ain't mine. How is that my income?  My income was what was left over … To me, if I owe you money, I can't pay you money out of the $300,000 because it's not mine, but I can pay you out of the $13,840 that's left."  (Tr. at 50-51).

## Conclusions of Law

While the fundamental goal of the Bankruptcy Code is to provide the honest debtor with a fresh start, such a policy must be tempered by the need to prevent dishonest debtors from using the law as a shield. See Jones v. J.G. Wentworth S.S.C. Ltd. Partnership (In re Berghmann), 235 B.R. 683, 693 (Bankr. M.D. Fla. 1999) (citing Bracco v. Pollitt, 145 B.R. 353, 355 (Bankr. M.D. Fla. 1992).  Exceptions to discharge are construed strictly against creditors and liberally in favor of honest debtors.   In re St. Laurent, 991 F.2d 672, 680 (11th Cir. 1993).   Under the circumstances prescribed in 11 U.S.C. § 523, certain debts will be excepted from a debtor's discharge.  Here, Plaintiffs seek to except Defendant's debt to them from Defendant's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

### 11 U.S.C. § 523(a)(2)(A)

Plaintiffs seeks to have the debt Defendant owes to them excepted from Defendant's discharge pursuant to § 523(a)(2)(A) which provides, in pertinent part, as follows:

A discharge … does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2)(A) sets forth three separate grounds for non-

dischargeability: false pretenses, a false representation, and actual fraud. Plaintiffs assert that the $87,081.13 paid to MM&T by HBI as a result of the June 13, 2008 and November 4, 2008 invoices should be excepted from Defendant's discharge pursuant to the false representation ground in § 523(a)(2)(A) and that the $176,190.05 paid to MM&T by SWH should be excepted from Defendant's discharge pursuant to the false pretenses ground in § 523(a)(2)(A).

"Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud. A creditor must prove that: (1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998).

> [However], [t]he concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive . . . It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor . . . Silence or concealment as to a material fact can constitute false pretenses.

Taylor v. Wood (In re Wood), 245 Fed. App'x 916, 918 (11th Cir. 2007) (quoting FCC Nat'l Bank v. Gilmore (In re Gilmore), 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998)). Plaintiffs bear the burden of proving the above elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991).

The preliminary determination the Court must make as to both the false representation and the false pretenses claims is whether Defendant intended to deceive Plaintiffs. Upon thoughtful consideration of the evidence before it, including Defendant's testimony, which the

Court finds to be credible, the Court concludes that Defendant did not intend to deceive Plaintiffs.

As to the money Defendant received from HBI, Plaintiffs argue that Defendant's submission of invoices for miscellaneous steel he knew he did not provide evidences an intent to deceive.  McQuaig directed Defendant to issue an invoice to HBI and specify that he provided miscellaneous steel.  While Defendant did not provide miscellaneous steel to HBI, he did provide a racing motor, wheels, tires, gears and other race cars parts to McQuaig.  Defendant believed that McQuaig was spending the money he saved on projects for HBI, which he was permitted to spend as he desired.  Given McQuaig's position at HBI, Defendant did not find unusual or suspicious McQuaig's explanation that if he completed a project early he could use the excess money as he desired.  Defendant had a long term relationship with McQuaig, believed he knew him well, and considered him a friend and someone he could trust.  Over the course of their long friendship, McQuaig did not engage in any conduct that caused Defendant to doubt or question him.  While Defendant's invoice was inaccurate, the Court does not find that Defendant intended to deceive HBI.

As to the money Defendant received from SWH, Plaintiffs suggest that Defendant's payment of a portion thereof to Owens & Associates, a company owned by McQuaig, is "wholly inconsistent with any suggestion that the invoices were legitimate, completely eradicating any argument that Defendant did not intend to deceive Plaintiffs."  The evidence is clear that Defendant was not aware of the three invoices fraudulently prepared by McQuaig until he spoke with Plaintiffs' investigator in July of 2010.  Ruling in favor of Plaintiffs would require a finding that Defendant "create[d] a false and misleading set of circumstances, or a false and misleading understanding of a transaction" by which he wrongfully induced SWH to give him the four

checks.  In order to make such a finding, the Court would have to find that Defendant believed that McQuaig was embezzling money from Plaintiffs rather than that Plaintiffs were sponsoring McQuaig's racing endeavors.  The Court declines to make such a finding for two reasons.  First, as the Court explained, Defendant completely trusted McQuaig.  In addition, one of the race cars Defendant built for McQuaig, which was emblazoned with the logos of Sheltair Aviation and HBI, was displayed at Sheltair Aviation's fixed based operation at Daytona International Airport, located next to the Daytona International Speedway, during the Pepsi 400 race *prior* to Defendant's receipt of the last four checks.  Defendant saw a picture of the car displayed at Sheltair Aviation's facility and believed (reasonably so) that Plaintiffs were aware of McQuaig's dealings.  Plaintiffs offered no explanation for the car's presence at their facility.

The Court finds that Defendant did not make a false representation to deceive HBI when he submitted the two invoices to HBI.  The Court also finds that Defendant did not "create a false and misleading set of circumstances, or a false and misleading understanding of a transaction" in order to wrongfully induce SWH to give him the four checks.  Accordingly, the Court will not except Defendant's debt to Plaintiffs from Defendant's discharge pursuant to § 523(a)(2)(A).

### 11 U.S.C. § 523(a)(6)

Plaintiffs also seek to have Defendant's debt to them excepted from his discharge pursuant to § 523(a)(6) of the Bankruptcy Code which provides that "[a] discharge … does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  To except a debt from discharge under § 523(a)(6), a plaintiff must prove by a preponderance of the evidence that a debtor deliberately and intentionally injured the plaintiff's property by a willful and malicious

14

act.  Conseco v. Howard (In re Howard), 261 B.R. 513, 520 (Bankr. M.D. Fla. 2001) (citations omitted).  "A debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or is substantially certain to cause injury."  Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting In re Walker, 48 F.3d 1161, 1163 (11th Cir. 1995)).  Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.  Id.

Plaintiffs point to the case of In re Van Loan, 114 B.R. 760 (Bankr. M.D. Fla. 1990) and claim that its reasoning supports their position that Defendant's debt to them should be excepted from his discharge.  In that case the court held that a judgment for conversion entered by a state court was non-dischargeable pursuant to § 523(a)(6).  Id. at 763.  The court followed the line of authority which interpreted "willful" as requiring only an intentional act resulting in injury rather than requiring an act with the intent to injure.  Id. at 762.  The court stated that "an intentional act of conversion which produces harm and is without just cause or excuse may be characterized as 'willful and malicious' notwithstanding the fact that there may be no proof that the Debtor had a specific intent to injure the creditor."  Id.  As the Eleventh Circuit has defined "willful" in § 523(a)(6) as requiring either an intent to, or a substantial certainty of, causing injury, the reasoning of In re Van Loan is unavailing.

 "In order to establish a claim for conversion of money under Florida law, a plaintiff must demonstrate, by a preponderance of the evidence: (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so."  United States v. Bailey, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003).  Neither knowledge nor intent is required to maintain an action for conversion.  Id.  (citations omitted).  As the Court noted, the

Judgment contains no findings that Defendant acted with fraudulent intent.  For the reasons set forth in the Court's discussion of § 523(a)(2)(A), the Court finds that by submitting the invoices to HBI and accepting the payments from SWH, Defendant did not intend to cause injury to Plaintiffs or know that his acts were substantially certain to cause injury to Plaintiffs.  The Court will therefore not except Defendant's debt to Plaintiffs from Defendant's discharge pursuant to § 523(a)(6).

### 11 U.S.C. § 727(a)(4)(A)

"In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets."  Schultz v. U.S., 529 F.3d 343, 346 (6th Cir. 2008).  "In order for an individual to get this extraordinary relief, the Bankruptcy Code requires that a Chapter 7 debtor fulfill certain fundamental duties, the most essential of which is the complete and honest disclosure of assets and recent transfers by the debtor."  Syngenta Seeds, Inc. v. Eigsti (In re Eigsti), 323 B.R. 778, 783 (Bankr. M.D. Fla. 2005).  "When a debtor does not fully disclose assets or recent transfers on . . . sworn Schedules or Statements of Financial Affairs, the court may decide to deny discharge of debt pursuant to 11 U.S.C. § 727."  Id.

Section 727(a)(4)(A)  provides for denial of a debtor's discharge if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account."  11 U.S.C. § 727(a)(4)(A).

> [T]he very purpose of … § 727(a)(4)(A) is to [ensure] that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction … Neither the trustee nor the creditors should be

required to engage in a laborious tug-of-war to drag the simple
truth into the glare of daylight.

Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987).

A party seeking the denial of a discharge pursuant to § 727(a)(4)(A) must establish the

following elements: 1) the debtor made a statement under oath; 2) the statement was false; 3) the

debtor knew the statement was false; 4) the debtor made the statements with fraudulent intent;

and 5) the statement related materially to the bankruptcy case. Shappell's Inc. v. Perry (In re

Perry), 252 B.R. 541, 549 (Bankr. M.D. Fla. 2000). A false oath may involve a false statement

or omission. Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 62 (B.A.P.

9th Cir. 1999). "There is a difference between a debtor who is trying to hide assets with a false

oath or material omissions in his Statement of Financial Affairs, and a debtor who, through

inadvertence, mistake, or ignorance … omits[s] certain assets …" In re Dupree, 336 B.R. 520,

527 (Bankr. M.D. Fla. 2005). In determining whether a debtor has the requisite fraudulent

intent, a court should analyze whether omissions or nondisclosures are "part of a scheme … to

retain assets for [the debtor's] own benefit at the expense of his creditors." Id.

Defendant made statements under oath when he filed his Original SOFA. Additionally,

Defendant's Original SOFA contained a number of errors. First, it listed Defendant's income for

2012 as gross self-employment income in the amount of $15,970.00 when in fact Defendant's

gross self- employment income for 2012 was $350,345.39 (according to the Amended SOFA) or

$282,797.00 (according to Defendant's 2012 federal tax return). Second, the Original SOFA

listed Defendant's income for 2013 as gross self-employment income in the amount of 13,840.00

when in fact Defendant earned wages in 2013 of $10,840.00 and had gross self-employment income of $353,526.78.  Accordingly, the Original SOFA was false.[4]

The disputed issue is whether Defendant knew his Original SOFA was incorrect and completed it with fraudulent intent.  Plaintiffs assert that Defendant knew his statements on the Original SOFA were false.  Plaintiffs point to Defendant's explanation as to how he determined the original amounts and sources of income on the Original SOFA.  Specifically, Plaintiffs point to Defendant's testimony as to whether he used the 1099s to calculate his 2013 income.  Defendant first stated on direct examination that he did not include his 1099 income from 2013 to calculate his 2013 income on the original SOFA.  On cross examination, Defendant testified that he did use his 1099s.  After being confronted on redirect with his prior deposition testimony where he testified that he did not have his 1099s at the time he filed the Original SOFA, Defendant testified that he had "no clue" how he could have relied on 1099s he did not have.  Plaintiffs assert that Defendant was "caught in a lie" and that his inconsistent testimony as to his use of 1099s to determine his 2013 income evidences that he knew the amounts on his Original SOFA were false.

Defendant testified that he believed the income figures requested by the Original SOFA were those amounts available for payment to creditors after the payment of business expenses.  The Court finds that Defendant included the 1099 income he received in 2013 to calculate his business income on his Original SOFA, which he ultimately determined to be zero, after subtracting his business expenses.  Whether Defendant had actually received the 2013 1099s prior to completing the Original SOFA is irrelevant as the 1099 income was ascertainable from a

_____

[4] Plaintiffs also assert that Defendant made false statements on his Schedules I and J and the CMI Calculation. However, because Defendants' Amended Schedules I and J and Amended CMI Calculation were not offered into evidence, the Court makes no determination as to whether Defendant's original Schedules I and J and Defendant's original CMI Calculation contained false statements.  Nonetheless, the admission of these documents into evidence would not have changed the outcome of this proceeding.

review of Defendant's bank statements. The Court does not find that Defendant's inconsistent testimony regarding his use of the 2013 1099s in completing the Original SOFA evidences that Defendant knew the statements on his Original SOFA were false.

Defendant's explanation as to how he arrived at the income figures on the Original SOFA is bolstered by the fact that the CMI Calculation, which was attached to Defendant's petition, indicated that his gross income from self-employment and racing totaled $80,665.35 for the months of October 2013 through December 2013. If Defendant sought to defraud or mislead his creditors by leading them to believe his gross self-employment income for all of 2013 was $13,840.00, he would not have reported gross income of more than $80,000.00 for the last three months of the year.

Plaintiffs also point to the fact that Defendant testified that he obtained his 2012 gross self-employment income of $15,970.00 from his 2012 tax return when in fact the tax return reflected a business loss of $52,346.00. Plaintiffs argue that because Defendant's 2012 tax return does not support the amount claimed on his Original SOFA Defendant knew the amount claimed therein to be false. It is unclear how Defendant arrived at the $15,970.00 figure on his Original SOFA. However, even if Defendant knew that the amount of money available for payment to creditors after the payment of business expenses for 2012 was zero, yet knowingly listed that amount as $15,970.00, the Court finds that Defendant did not do so with fraudulent intent.

The Court finds that Defendant did not complete the Original SOFA with fraudulent intent. The Court finds Defendant's explanation credible and that the misstatements on the Original SOFA were a result of his misunderstanding of the income reporting requirements rather than a fraudulent scheme to retain assets for his own benefit at the expense of his

creditors.[5]    Accordingly, the Court will not deny Defendant's discharge pursuant to § 727(a)(4)(A).

### Conclusion

The Court finds that Defendant did not make a false representation to deceive HBI when he submitted the two invoices to HBI and did not "create a false and misleading set of circumstances, or a false and misleading understanding of a transaction" in order to wrongfully induce SWH to give him the four checks.   Accordingly, the Court will not except Defendant's debt to Plaintiffs from Defendant's discharge pursuant to § 523(a)(2)(A).   The Court finds that by submitting the invoices to HBI and accepting the payments from SWH, Defendant did not intend to cause injury to Plaintiffs or know that his acts were substantially certain to cause injury to Plaintiffs.   The Court will therefore not except Defendant's debt to Plaintiffs from Defendant's discharge pursuant to § 523(a)(6).   The Court finds that Defendant did not complete his Original SOFA with fraudulent intent and will therefore not deny his discharge pursuant to § 727(a)(4)(A).   The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.

---

[5] While Plaintiffs point out in their trial memorandum (Doc. 62 at p. 6 ) that Defendant "concealed a substantial amount of income, and could have easily prevented the discovery of numerous assets belonging to the estate by virtue of Debtor's false statements[,]"   Plaintiffs do not allege that Defendant failed to list any assets on his bankruptcy schedules.